IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LANCE FRIDLEY,

    Plaintiff,

v.

SOMERSET COUNTY JAILERS, et al.,

    Defendants.

Civil Action No.: JKB-22-2322

**MEMORANDUM OPINION**

Defendants Somerset County Jailers, Lt. Gregory Webster, CO II Rayfield, and Sgt. Daniel Baltezegar[1] move to dismiss Plaintiff Lance Fridley's complaint, or alternatively, for summary judgment in their favor. (ECF No. 20.) Fridley filed an opposition response (ECF No. 30) and Defendants replied. (ECF No. 31.) No hearing is necessary to determine the matters pending. *See* Local Rule 105.6 (D. Md. 2023). For the reasons stated below, Defendants' motion, construed as a motion for summary judgment, will be granted.

    I.    *Procedural and Factual Background*

    **A. Procedural history**

Fridley filed this civil rights complaint on September 13, 2022. (ECF No. 1.) On March 2, 2023, Defendants filed a motion to dismiss or, in the alternative for summary judgment. (ECF No. 9.) Fridley responded. (ECF Nos. 13, 17.)[2] Defendants then filed a "Motion to File Clarifying

---

[1] Although originally identified by Fridley as "Shawn Webster" and "Daniel Ballzigler," the evidence presented to the court clarifies that the correct names of Defendants are Lt. Gregory Webster and Sgt. Daniel Baltezegar, Sr. The Clerk shall amend the docket accordingly.

[2] To the extent Fridley raises additional claims in his opposition responses (for example, Fridley alleges that he was denied medical care at Eastern Correctional Institution, where he was transferred after the incidents complained of, or lacks access to legal materials (ECF No. 17 at 3-4), those claims are not properly before the court and will not be considered. *Mylan Laboratories,*

Memorandum and Submit Additional Documents" (ECF No. 18), wherein they explained that the dates in Fridley's initial complaint were not accurate, and they had located video regarding at least some of the events at issue. (*Id.*) The Motion was unopposed and on September 1, 2023, it was granted and the pending dispositive motion was denied without prejudice subject to renewal. (ECF No. 19.)

On September 25, 2023, Defendants filed the pending dispositive motion. (ECF No. 20.) Fridley was notified of his right to file a response in opposition. (ECF No. 24.) Fridley filed a "Motion to Compel Discovery" (ECF No. 26), which was opposed by Defendants. (ECF No. 27.) Fridley also filed a response in opposition to the dispositive motion (ECF No. 30), and Defendants replied. (ECF No. 31.) Lastly, Fridley filed a Motion to Appoint Counsel. (ECF No. 33.) Fridley's Motions for Discovery and Counsel were denied (ECF No. 34) and he was granted additional time to file a supplemental response but did not do so.

### B. Fridley's Allegations

In his Complaint, Fridley alleged that he was assaulted by Sgt. Webster and COII Rayfield at the Wicomico County Detention Center ("WCDC") on January 24, 2020. (ECF No. 1 at 2.) He also alleged that on January 27, 2020, he was assaulted by five or six officers before he went to court. (*Id.*) He stated that he did not have the names of those officers but was taken to court by

---

*Inc. v. Akzo, N. V.,* 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd,* 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs,* 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd,* 141 F.3d 1162 (4th Cir. 1998); *Woodbury v. Victory Van Lines,* 286 F.Supp.3d 685, 692 (D. Md. 2017) (stating it is axiomatic that a plaintiff may not use their memorandum in opposition to amend the complaint).

"CO II Ballzigler." (*Id.*) Fridley alleged that he "was beaten very badly and still need[ed] medical attention." (*Id.*) He sought monetary damages and unspecified injunctive relief. (*Id.* at 3.)

### C. Defendants' Response

Defendants filed a motion seeking dismissal of the Complaint or, in the alternative, summary judgment in their favor. (ECF No. 20-1.)

#### 1. *January 21, 2020, incident*[3]

On January 21, 2020, matters of record ("MOR") were written by CO II Rayfield and Lt. Webster[4] explaining that, at approximately 7:50 a.m. that day, they went to WCDC to transport Fridley to court. (ECF No. 20-7 at 1 (Rayfield MOR); ECF No. 20-7 at 2 (Webster MOR).) When escorting a detainee to court, typically two officers are used, particularly if the detainee is difficult or charged with a violent crime. (ECF No. 31-2 ¶ 4.) One officer secures the detainee with handcuffs, leg irons, and shackles, where appropriate, while the second officer observes. (*Id.*) Due to safety concerns, handcuffs are always placed in the front. (*Id.*)

Once at WCDC, the officers waited an hour for Fridley to come to the booking area to be transported. (ECF No. 20-7 at 1–2.) When he arrived in the booking area, he was upset, agitated, and disrespectful, and stated that he did not have to be to court until 9:30 a.m. (*Id.*) Rayfield applied the restraints, beginning with the waist chain/belt.[5] (*Id.*) Fridley reported that the waist restraint was too tight. (*Id.*) Rayfield checked the waist restraint and was able to place his entire

---

[3] In his opposition to the first dispositive motion, Fridley indicates that he agrees with the dates of the incidents offered by Defendants in their motion. (ECF No. 17 at 1–2.) He also clarifies that he was a pretrial detainee at the time of both assaults. (*Id.* at 5.)

[4] Lt. Gregory Webster avers that the MOR he prepared on January 21, 2020 is true and accurate. (ECF No. 31-2.)

[5] The restraint is described as both a chain and a belt in the records provided but the video makes clear that it is a leather type belt. (ECF No. 20, Ex. 9.)

hand in the restraint. (*Id.* at 1.) Rayfield then went to apply handcuffs, but Fridley stated that he was not "cuffing up" and put his hands behind his back to prevent Rayfield from applying the handcuffs. (*Id.*) Rayfield directed Fridley several times to put his hands in front to be handcuffed, but Fridley refused to comply. (*Id.*; ECF No. 20-7 at 2.) Rayfield put Fridley down on the bench and "retrieved his hands to be properly cuffed for transport." (ECF No. 20-7 at 1; *see also* ECF No. 20-7 at 2.) Webster assisted with placing the handcuffs on Fridley. (*Id.* at 2.) Throughout the encounter Fridley was disrespectful, aggressive, and difficult to restrain. (ECF No. 20-7 at 1.)

After securing the handcuffs, Rayfield placed leg irons on Fridley, and while doing so, Fridley kicked at Rayfield, nearly striking him. (ECF No. 20-7 at 1–2.) After the restraints were placed, Rayfield and Webster escorted Fridley to the van. (*Id.* at 1.) Fridley kicked, screamed, and yelled during the escort and spit in the transport van. (*Id.*) Fridley was taken to the Circuit Court for Somerset County where he was placed in a holding cell at 8:35 a.m. (*Id.* at 1–2.) Pictures of the scratches and bruises on Rayfield's right hand were apparently taken (*id.* at 1) but were not provided to the Court.

The WCDC officers did not assist in restraining Fridley but were present during the incident. (ECF No. 20-7 at 1.) WCDC Lt. Townsend and Officer Howell wrote a memo and MOR, respectively, regarding the incident explaining that, when the Somerset County Officer applied the waist belt, Fridley stated it was too tight, but the Somerset County officer said it was okay. (ECF No. 20-19 at 1 (Townsend memo); ECF No. 20-19 at 3 (Howell MOR).) Fridley then put his hands behind his back and the Somerset County Officer grabbed Fridley by his neck and placed him on the bench. (ECF No. 20-19 at 1.) Howell had briefly turned away from Fridley and when he turned back around Fridley was lying flat on his back on the bench with Rayfield restraining him. (ECF No. 20-19 at 3.) Fridley stated that he was not going to go anywhere with

Rayfield and he kept resisting. (*Id.*) "Fridley was raised up and placed on his feet" and continued to refuse to have the handcuffs placed. (*Id.* at 1.) Fridley then sat on the bench and the Somerset County Officer forcibly applied the handcuffs because Fridley would not comply. (*Id.*) Fridley continued to yell at the officers, but Rayfield was able to get Fridley on his feet and escort him to the van. (*Id.* at 3.)

WCDC Officers Blake and Holland also each prepared an incident report/MOR regarding the altercation. (ECF No. 20-19 at 5, 7.) They each reported that they heard yelling and responded to the area. (*Id.*) When Blake came on the scene, she observed Fridley "yelling and trying not to be handcuffed." (ECF No. 20-19 at 5.) Fridley was on the bench with a Somerset County officer trying to handcuff him. (*Id.* at 5.) Holland observed that Fridley was non-compliant with the Somerset County officers who ultimately were able to escort Fridley through the sally port while Fridley continued to curse at the officers and remained non-compliant. (*Id.* at 7.) Holland followed the officers out to make sure everything was okay. (*Id.*)

The videos of the incident, which show the booking area from inside "the cage", outside "the cage" and from the sally port and gate 2, confirm the reports of the officers. (ECF No. 20, Ex. 9 (filed separately).)[6] The video also shows that while Defendants attempted to restrain Fridley, an unidentified detainee remained seated on the bench adjacent to the bench where Fridley was placed. (*Id.*)

Fridley's medical records demonstrate that on the date of the incident, a medical intake was completed at 5:03 p.m. at Somerset County Detention Center ("SCDC"). (ECF No. 21-1 at 48.) No medical issues were noted other than Fridley reporting he took Tylenol for tooth pain. He was

---

[6] Fridley was provided an opportunity to view the videos. (*See* ECF Nos. 29, 30.)

referred to mental health and approved for general population. (*Id.*) Additionally, Webster avers that he did not observe any injuries to Fridley and Fridley did not complain of any injuries during their encounter or escort to court. (ECF No. 31-2 ¶ 5.)

### 2. *January 24, 2020, incident*

On January 24, 2020, Sgt. Baltezegar and Officers Phillips, Walston, Brimer, and Holbrook each wrote MORs regarding a different interaction with Fridley.[7] (ECF No. 20-8 at 2–4.) Baltezegar explains that, at the time of the incident, he was in processing with Warden Hickman while Officer Brimer attempted to put restrains on Fridley so he could be transported to court. When Brimer attempted to place handcuffs on Fridley, Fridley became disrespectful, pulled away from Brimer, and refused to allow the handcuffs to be placed. (*Id.* at 2.) Additionally, Fridley threatened, "I'm going to buck on you all, you are going to have nothing but problems out of me." (*Id.*) Observing this interaction, Baltezegar came out of the processing area to the intake hallway to assist the officers in restraining Fridley. (*Id.*)

Baltezegar, Phillips, and Holbrook put Fridley on the floor to gain control and place the restraints. (*Id.* at 2.) Shortly thereafter, Baltezegar heard someone say, "ok the restraints are on." (*Id.*) The officers explain that Officer Phillips took control of Fridley's left wrist/arm while Brimer placed the handcuffs, Officer Walston took control of Fridley's left foot while the leg irons were placed, and Officer Holbrook controlled Fridley's right arm and wrist and waited for the handcuffs to be applied. (*Id.* at 4.) The officers then got up and moved Fridley on to his left side. Baltezegar and Philips began to help Fridley up and Fridley stated that he could not breathe. Baltezegar told

---

[7] Assistant Warden James Balderson (ECF No. 20-9), Sgt. Daniel W. Baltezegar, Sr. (ECF No. 20-11), CO II Casey Brimer (ECF No. 20-12), Sgt. Jerry Holbrook (ECF No. 20-14), Sgt. Eric Phillips (ECF No. 20-16) each aver that the statements contained in in their MORs regarding the January 24, 2020, incident are true and accurate.

Fridley to calm down. Fridley's legs began to shake for about ten seconds. (*Id.*) Fridley stated, "See, I had a seizure, which one you motherfuckers choked me out?" (*Id.*) Baltezegar told Fridley that he was not choked: he was talking and fighting the entire time. (*Id.*)

Baltezegar advised Fridley that he would get medical to check him, but Fridley refused stating, "fuck that, I don't need any of you motherfuckers to touch me." (*Id.*) Baltezegar again directed Fridley to calm down and let medical check him if he believed he had a seizure. (*Id.*) But Fridley refused, saying he did not wany any treatment. (*Id.*) He reported that that he bit his tongue during the incident and Baltezegar observed a small amount of blood on Fridley's lip. (*Id.*) Nevertheless, Fridley continued to refuse to have medical evaluate him. (*Id.*)

After Fridley calmed down and Baltezegar believed it was safe to transport him to court, Baltezegar observed that Fridley's cuffs had not been secured to the restraint belt. (*Id.*) Baltezegar removed Fridley's left hand from the handcuffs so they could be secured to the belt. (*Id.*) Once both of Fridley's hands were properly restrained, Baltezegar again instructed Fridley to stay calm during the transport and during court because things would only get worse if he acted out in the courtroom. (*Id.*) Fridley responded that he was "going to stay calm until I get back and then I'm going to flip out. I'm gon to flood the cell and you all are going to have to fight me every day." (*Id.*)

Assistant Warden James Balderson was in the processing area waiting to take Fridley to court at the time of the incident. (ECF No. 20-8 at 1.) Balderson confirms that Fridley resisted being handcuffed and Holbrook, Baltezegar, Phillips, Brimer and Walston placed Fridley on the floor to gain control of him. (*Id.*) After Fridley was restrained in handcuffs and leg irons he was helped to sit up. (*Id.*) When he sat up Fridley stated, "I can't breathe." (*Id.*) Baltezegar instructed Fridley to calm down and try to relax. (*Id.*) Medical was called to evaluate Fridley but Fridley

7

stated, "I don't want them to touch me, they can't do anything for me." (*Id.*) A doctor was in the area but Fridley told the doctor not to touch him and the doctor stepped away from Fridley. (*Id.*) Fridley was assisted into a chair outside of the medical unit. (*Id.*)

Fridley's medical records indicate that on January 24, 2020, at 8:15 a.m. medical was notified by custody staff that Fridley needed medical assistance. (ECF No. 21-1 at 48.) Fridley was in the hallway outside of medical laying on his back, shaking with his tongue sticking out. (*Id.*) Custody was instructed to put Fridley on his side. (*Id.*) Fridley began to yell that he could not breath and yelled and cussed at staff. (*Id.*) He was placed on a chair in the hallway, where he continued to yell and argue with custody staff. (*Id.*) Fridley refused to come into the medical unit to be evaluated yelling "don't touch me" when staff attempted to evaluate him. (*Id.*) Fridley continued to yell and argue with staff banging on the phone and banging on the desk. (*Id.*)

Approximately thirty minutes later, after Fridley had calmed down, he was taken to court by Baltezegar and Balderson. (ECF No. 20-8 at 1; ECF No. 20-8 at 2, 4.)

## II. *Standard of Review*

Defendants argue that the Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), or that summary judgment should be granted in their favor pursuant to Federal Rule of Civil Procedure 56. (ECF No. 20-1.)

Defendants' motion is styled as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate a court's discretion under Rule 12(d). *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*,

8

149 F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

Because Defendants filed their motion as a motion to dismiss, or in the alternative, for summary judgment, Fridley was on notice that the Court could treat the motion as one for summary judgment and rule on that basis. Further, although Fridley has filed an opposition to the motion, he does not claim that he requires additional discovery and in fact states: "Videos is the evidence proof" (ECF No. 30-1), and the Court is in receipt of and has reviewed the relevant videos. Accordingly, the Court will review Fridley's claims against Defendants under the Rule 56(a) standard and will consider the exhibits filed in support of the dispositive motion.

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). A court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable

inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

The Court is mindful, however, that Fridley is a self-represented litigant. A federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But liberal construction does not mean a court can ignore a clear failure in the pleadings to allege facts which set forth a claim. *See Weller v. Department of Social Services*, 901 F.2d 387, 391 (4th Cir. 1990). A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

### III. Discussion

At the time of the events complained of, Fridley was a pretrial detainee. Accordingly, his claims are analyzed under the Fourteenth Amendment. *See Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001); *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992). Liberally construed, Fridley asserts that Defendants used excessive force, on two separate occasions, in violation of the Fourteenth Amendment. "The constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment." *Barnes v. Wilson*, 110 F.Supp.3d 624, 629 (D. Md. 2015) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). In turn, the Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const, amend. VIII; *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).

To prevail, Fridley must show that "the use of force is deliberate – *i.e.*, purposeful or knowing." *Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015). Fridley need not detail his alleged assailant's subjective state of mind. Rather, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-97; *see also Dilworth v. Adams*, 841 F.3d 246, 255 (4th Cir. 2016). Objective reasonableness "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The court must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with 20/20 vision of hindsight." *Id.* at 397.

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). The court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986).

However, the absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether the force used was necessary in a particular situation. But if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id.* at 38.

Defendants contend that on each occasion the force used was legally justified. The Court agrees.

11

As to the first incident, on January 21, 2020, the undisputed evidence demonstrates that after the waist restraint was placed on Fridley, Fridley moved his hands behind his back and refused to be handcuffed. All the contemporaneous reports agree that Fridley was argumentative, hostile, and refused direct orders to have handcuffs applied, all while physically keeping his hands behind his back so that he could not be secured. He was quickly pushed down on to the bench, where once on his back, the officers were able to pull his hands from behind his back and secure the handcuffs. While Fridley sat on the bench the officer went to place the leg restraints on Fridley and Fridley kicked at the officer. None of the officers retaliated, rather they applied the leg restrains and escorted him out of the facility while Fridley continued to resist the escort. There is no evidence that Fridley was injured in any way during this encounter. The application of force was necessary because Fridley was unsecured in the booking area of WCDC while another detainee sat on the bench. It is also clear that Fridley refused to cooperate with being restrained, physically refused to be restrained, and struck out at the escorting officer. The record shows that the amount of force applied was only that which was necessary to secure Fridley and escort him to court. Fridley, who refused to have handcuffs applied, who disobeyed a direct order, and who then kicked at correctional staff, posed a serious risk to institutional safety. On this record, Defendants are entitled to summary judgment as the first incident.

As to the second incident on January 24, 2020, again, the undisputed record evidence demonstrates that the amount of force applied was reasonable under the circumstances. Once again Fridley refused to be secured for transportation to court. He refused direct orders from staff to be restrained, verbally threatened staff, and pulled away from staff who were attempting to secure him. Officers put Fridley on the floor to gain control and place the restraints. Once the restraints were placed, the officers released Fridley and moved him to his left side. Reports indicate that

Fridley was "shaking" during the incident, and he believed he suffered a seizure, but he refused all medical evaluations offered. Ultimately it was determined that Fridley had merely bit his tongue or lip during the altercation. Approximately thirty minutes after the altercation, Fridley was transported to court.

Other than the bit tongue, there is no evidence that Fridley was injured during this encounter. More importantly, it is clear on the record before the Court that the force applied was necessary as Fridley refused direct orders to be secured and pulled away from staff while verbally threatening them. The amount of force applied was only that which was necessary to secure Fridley, and as soon as the restraints were applied, the officers released him. Fridley, who refused to have handcuffs applied, disobeyed a direct order and threatened staff, posed a serious risk to the safety of the officers and the institution. The officers responded reasonably by using only the amount of force necessary to restrain him. Defendants are entitled to summary judgment as to the second incident.

### IV.   Conclusion

For the foregoing reasons, Defendants' motion, construed as a motion for summary judgment, (ECF No. 20) will be granted and judgment will be entered in Defendants' favor. A separate Order follows.

Dated this 9 day of Sept., 2024.

FOR THE COURT:

/s/ James K. Bredar
James K. Bredar
United States District Judge

13